**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
In re:

        DESOTO OWNERS LLC

                        Debtor.
--------------------------------------------------------x
In re:

        DESOTO HOLDING LLC

                        Debtor.
--------------------------------------------------------x

Chapter 11
Case No.  20-43387 (JMM)

Chapter 11
Case No.  20-43388 (JMM)

**DISCLOSURE STATEMENT CONCERNING FIFTH AMENDED JOINT PLAN OF LIQUIDATION**

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

SUBMITTED BY:

Isaac Nutovic, Esq.
NUTOVIC & ASSOCIATES
261 Madison Avenue, 26th Floor
New York, N.Y. 10016
(212)421-9100

*Attorneys for Desoto Owners LLC and Desoto Holding LLCs*

Dated:  August 13, 2021

1

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN OF LIQUIDATION FOR THE DEBTORS.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XI HEREIN. THE PLAN IS SUPPORTED BY THE DEBTORS.  THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS. THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN. CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN THE PLAN.  THERE IS NO

**ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED. YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING BUT NOT LIMITED TO THE PLAN BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.**

## I.    INTRODUCTION

Desoto Owners LLC ("Desoto Owners") and Desoto Holding LLC ("Desoto Holding" and, collectively with Desoto Owners, the "Debtors") file this Disclosure Statement for the Fifth Amended Joint Plan of Liquidation (the "Disclosure Statement") pursuant to the requirements of section 1125 of the Bankruptcy Code. This Disclosure Statement relates to the Fifth Amended Joint Plan of Liquidation, dated August 11, 2021 (the "Plan") filed by the Debtors in each of their the Chapter 11 Cases. A copy of the Plan is attached hereto as **Exhibit "A"**. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Plan or the Bankruptcy Code, as may be applicable, which are incorporated herein by reference.

The Plan undertakes to resolve all Secured Claims, Administrative and Priority Claims, and General Unsecured Claims, as well as all Interests. The Debtors believe that distribution pursuant to the terms of the Plan will produce for creditors more than they would receive if the Chapter 11 Cases were to be converted and the assets of Debtors liquidated under Chapter 7 of the Bankruptcy Code and the proceeds distributed according to the priorities and in the manner prescribed by the Bankruptcy Code.

> **AS A CREDITOR OF THE DEBTORS, YOU CAN VOTE TO ACCEPT OR REJECT THE PLAN. THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO HOLDERS OF CLAIMS.  AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    <u>SUMMARY OF THE PLAN</u>

THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED IN ITS ENTIRETY BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS.

The Plan is a liquidating plan and provides for the marketing and auction sale of the Debtors' sole significant asset—the 58 acre parcel of land (the "<u>Mall Property</u>") which formerly housed an operating mall. CBRE Inc. will perform marketing and auction services in accordance with a court approved retention agreement.  In addition, Meyer Lebovits and/or ML Estate Holdings LLC ("<u>ML Holdings</u>" and, together with Meyer Lebovits, the "<u>ML Parties</u>") will provide $650,000 ( the "<u>GUC Administrative Reserve</u>") to be used to pay statutory fees of the U.S. Trustee, administrative expenses and unsecured claims.

Proceeds of the Mall Property will be used to pay real estate tax claims against the Mall Property and Romspen. If funds remain after those claims are paid in full, the proceeds will be used to pay administrative expenses not fully paid by the GUC Administrative Reserve.

The Debtors will make Distributions to the Holders of Allowed Claims on or about the Effective Date which is when the transfer of the Mall Property to the Winning Bidder occurs.

With respect to Hudson's Furniture Showroom, Inc. ("Hudson's"), which is the Holder of the Class 4 Claims, Desoto Owners will assume the Hudson's Lease, assign same to the Winning Bidder,  and, thereafter, Hudson's will waive any claims it may have. The assumption of the Hudson's Lease is conditioned on it being assigned. The Mall Property will be sold subject to Hudson's lease and purchase option rights.

Each Holder of a Class 5 Allowed General Unsecured Claim shall receive its Pro Rata Share of $40,000, payable from the GUC Administrative Reserve.

The Holders of Class 6 Interests in the Desoto Owners will receive no distribution under the Plan.

The Holders of Class 7 Interests in Desoto Holding will receive no distribution under the Plan.

As prescribed by the Bankruptcy Code and the Bankruptcy Rules, Claims asserted against, and Interests in, the Debtors are placed into "Classes." The Plan designates multiple separate Classes of Claims and Interests. The classification of Claims and the treatment of each Class are discussed in detail below, as well as in Articles III and IV of the Plan.

Because the plan calls for a liquidation of substantially all of the Debtors' assets, the Debtors will not receive a discharge of their debts.

### III.    **VOTING ON AND CONFIRMATION OF THE PLAN**

A.    **What is Chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    **Why Am I Receiving This Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with these requirements.

C.    **Are You Entitled to Vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | MTAG Secured claim | Unimpaired | Not Entitled to Vote |
| 2 | ATCF Secured Claim | Unimpaired | Not Entitled to Vote |
| 3 | Romspen Secured Claim | Impaired | Entitled to Vote |
| 4 | Hudson's | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Interests in Desoto Owners LLC | Impaired | Not Entitled to Vote |
| 7 | Interests in Desoto Holding LLC | Impaired | Not Entitled to Vote |

D.    **What Will You Receive if the Plan is Consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE

ESTIMATES ONLY.  REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.

| Class | Claim or Interest | Treatment of Claim/Interest | Projected Claim Amount | Projected Recovery |
|---|---|---|---|---|
| 1 | MTAG | Lien remains in place until Mall Property sold and claim paid in full | $477,771 | $477,771 |
| 2 | ATCF | Lien remains in place until Mall Property sold and claim paid in full | $483,243 | $483,243 |
| 3 | Romspen's Secured Claim | Lien remains in place until Mall Property sold. Receives all auction proceeds after payments of real estate tax liens and the claims of class 1 and Class 2 creditors | | $unknown |
| 4 | Hudson's | Lease and Purchase Option assumed. | $0 | $0 |
| 5 | General Unsecured Claims | Claim Holders will receive Pro Rata Share of $40,000 | $1,400,000 plus Romspen Deficiency Claim | *Pro Rata* Share of $40,000 |
| 6 | Interests in Desoto Owners | Holders of these membership interests will receive no distribution | 100% Membership Interests | $0 |
| 7 | Interests in Desoto Holding | Holders of these membership interests will receive no distribution | 100% Membership Interests | -$0 |

**E.      What Happens to My Recovery if the Plan is Not Confirmed or Does Not Go Effective?**

In the event that the Plan is not confirmed or does not go effective, it is possible that any alternative transaction may provide Holders of Claims with less than they would have received pursuant to the Plan.

**F.      If the Plan Provides that I Get a Distribution, Do I Get It Upon Confirmation or When the Plan Goes Effective, and What is Meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective."  Distributions to Holders of Allowed Claims can only be made on the date the Plan becomes effective — the "Effective Date" — or as soon as reasonably practicable thereafter, as specified in the Plan.

"Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means:  (1) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (2) assumption by the Debtor or by the successor to the Debtor under the Plan of

the business or of the management of all or substantially all of the property dealt with by the Plan; and (3) commencement of Distributions under the Plan.  Note that Holders of certain types of Claims, such as General Unsecured Claims, may not receive any Distributions until the Debtors have reconciled all such Claims, which could take several months or longer following the Effective Date.

**G.      What Will I Receive Under the Plan if I hold an Allowed  
Administrative Claim, Priority Tax Claim, or a Professional Fee Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and Statutory Fees have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    Administrative Claims.

Except to the extent that an Administrative Claim has already been paid during the Chapter 11 Case or a Holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive their *pro rata* share of $610,000 from the GUC Administrative Reserve, less the amounts needed to pay U.S. Trustee fees in full, on the latest of:  (a) the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; <u>provided</u>, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

Except as otherwise provided in Article II of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. ***Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor or its Property and such Administrative Claims shall be deemed discharged as of the Effective Date.***  Objections to such requests, if any, must be Filed and served on the Debtors and the requesting party by the deadline established for such objections under Section 8.01 of the Plan.

The holders of Administrative Claims shall receive their *Pro Rata* Share of $610,000 less the amounts needed to pay statutory fees of the U.S. Trustee in full.

2.    Priority Tax Claims.

Allowed Priority Tax Claims shall be paid, at the election of the Debtors, in full, with statutory interest within five (5) Business Days after the Closing Date of the Auction Sale of the Mall Property.  If Romspen is the Winning Bidder at the Auction Sale, it shall advance these funds at the closing.
.

3.    Professional Fee Claims.

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Effective Date shall be Filed no later than twenty (20) days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, and once approved by the Bankruptcy Court, shall be promptly paid from the GUC Administrative Reserve subject to the Administrative Claims Cap..

    4.   <u>Statutory Fees</u>.

All fees and interest due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Debtors shall pay any and all such fees and interest when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Debtors shall remain obligated to pay quarterly fees and interest to the U.S. Trustee until the earliest of each Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**H.**    <u>**Are Any Regulatory Approvals Required to Consummate the Plan**</u>?

There are no known regulatory approvals that are required to consummate the Plan. However, in order to proceed with development of the Parcel A Property the Debtors will have to obtain final approval from Manatee County.

**I.**    <u>**Is There Potential Litigation Related to Confirmation of the Plan**</u>?

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation. *See* Article X of this Disclosure Statement, entitled "Certain Risk Factors."

If it becomes necessary to confirm the Plan over the rejection of a certain Class(es), the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Class(es). The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.

**J.**    <u>**Will there be releases and exculpation granted to parties in interest as part of the Plan**</u>?

  **YES, THE PLAN PROPOSES THAT UPON CONFIRMATION CERTAIN PARTIES WILL BE EXCULPATED FROM ALL CLAIMS RELATING TO THE CONDUCT OF THE BANKRUPTCY CASE**. The Exculpated Parties are essentially those who have held fiduciary positions or performed professional services for the Debtors. They are defined in Section 1.45 of the Plan. All of the the Exculpated Parties have made substantial and valuable contributions to the restructuring through efforts to negotiate and implement the Plan, which will maximize the value of the Debtors' assets for the benefit of all parties in interest. Accordingly, each of the Exculpated Parties warrants the benefit of the exculpation provisions.

**K.**    <u>**The Confirmation Hearing**</u>.

The confirmation of a plan of reorganization by a bankruptcy court binds the Debtors, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a Debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

The Bankruptcy Court has scheduled the Confirmation Hearing for _____, at _____ a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than _____, at 5:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit "B"** and incorporated herein by reference.

### L.      Voting to Accept or Reject the Plan.

You will find a ballot included in the envelope with this Disclosure Statement. **PLEASE MARK THE BALLOT** to indicate whether you vote to **ACCEPT or REJECT** the Plan. After you have completed your Ballot, place the Ballot in the enclosed, pre-addressed, pre-stamped envelope and place the envelope in the mail, or as set forth in the Order Approving this Disclosure Statement, as soon as practicable.

**YOUR BALLOT MUST BE RECEIVED BY THE BALLOT AGENT, BY NO LATER THAN 5:00 P.M. (ET) ON_____, OR IT WILL NOT BE COUNTED.**

Upon receipt, the Ballots will be tabulated, and the results of the voting will be presented to the Bankruptcy Court for its consideration.  As described in greater detail in Article XII of this Disclosure Statement, the Bankruptcy Code prescribes certain requirements for Confirmation of a plan.

**The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believes the Plan, is in the best interest of all Holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.**

## IV.      CHAPTER 11 PROCEEDINGS

### A.      Background

The Debtors filed their petitions for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court on September 22, 2020. Under the provisions of the Bankruptcy Code, the Debtors are continuing as debtors in possession, subject to the supervision of the Bankruptcy Court and the U.S. Trustee.

### B.      The Debtors; Events Leading to the Chapter 11 Case

Desoto Owners owns the Desoto Square Mall in Bradenton in Manatee County, Florida (the "Mall") which sits on the Mall Property. Desoto Holding currently owns all of the membership interests in Desoto Owners having acquired them immediately prior to the commencement of the Debtors' cases.

By Purchase and Sale Agreement dated August 8, 2016, ML Holdings contracted to purchase the Mall Property from Desoto Square Mall, LLC ("Seller"). At the closing, title to the Mall Property was taken by the Desoto Owners with Romspen providing a loan of approximately $18,500,000 to Desoto Owners to complete the transaction and the equity owners contributing approximately $8,500,000. At the time of closing each of ML Holdings and UK Palm LLC held a 50% membership interest in Desoto Owners. The Mall Property was acquired with the idea of reinventing and reinvigorating the Mall and possibly developing some of the adjoining property alongside the Mall.

After taking control of the Mall, management discovered that the Seller had perpetrated a fraud on ML Holdings. Records and information provided by the Seller (i) fraudulently disguised the Seller's complete disregard for the Mall's physical condition and security, (ii) inflated the income generated by the Mall, (iii) reflected phantom tenants; and providing a phony Subordination, Non-Disturbance and Attornment Agreement from Hudson's, one of the anchor tenants. Taken together, they resulted in a massive overstatement of the Mall's finances and profitability. ML Holdings has sued the Seller in an action which is pending in the Supreme Court of New York, County of Kings under Index No. 522621/2018.

Shortly after the closing of the transaction, Desoto Owners retained a national management company to upgrade the Mall buildings, assist in management of the Mall and to attract new tenants. Once the Seller's fraud was discovered, Desoto Owners began focusing on development possibilities. A law firm specializing in local zoning and real estate law, a prominent urban design planning firm, and a national broker were retained to advise on how best to develop the Mall and the Property. Desoto Owners also consulted with a major Florida construction firm. As the development professionals were formulating their plans the hidden shortcomings of the Mall were slowly being exposed. As a result, the initial designs, which were to build around some, or all, of the Mall buildings, were scrapped in favor of a complete redevelopment of the entire Mall Property.

The final concept around which Desoto Owners' advisors coalesced was to demolish the Mall and create a mixed-use development, to be built in three stages, with residential, medical and commercial components. The development team started meetings with county and zoning officials to sound them out on various aspects of the concept and to discuss procedures for fast-tracking approval of the proposed plans. An engineering firm was engaged in early 2019 and a significant study was done on water management for the Property. By the end of 2019/ beginning 2020 the team was meeting with Manatee County about shepherding the preliminary site plan (the "PSP") through the approval process.

While Desoto Owners was searching for a recovery from the fraud perpetrated by the Seller it struggled to make payments to Romspen. In addition to the monies initially advanced by Romspen to close the acquisition of the Mall Property, Romspen had agreed to advance additional funds to be used to make improvements at the Mall. That loan facility was closed when Desoto Owners went into default and various vendors Desoto Owners had engaged to render services were left unpaid.

Romspen subsequently commenced a foreclosure action. On January 30, 2020, a Judgement of Foreclosure was entered in Case No. 2018CA003897AX in the Circuit Court of the Twelfth Judicial Circuit in Manatee County, Florida in the amount of $29,350,990.62. The Judgment of Foreclosure specifies that "the final judgment of foreclosure and subsequent title to the property in favor of Romspen or its designee, assignee or successor-in-interest shall be subject to that certain Memorandum of Lease Agreement by and between Simon Capital Limited Partnership and Spectrasite Communications, Inc., dated March 15, 2004 and recorded on March 26, 2004". The Judgment of Foreclosure also specifies that "the final judgment of foreclosure and, if applicable, subsequent title to the property in favor of Romspen or its designee, assignee or successor- in-interest, shall be subject to that certain Lease and Purchase Option by and between Desoto Square Mall, LLC and Hudson's Furniture Showroom, Inc , (the "Lease and Purchase Option") as evidenced by that certain Memorandum of Lease and Purchase Option recorded on January 22, 2014".

At the time it extended its loan facility to Desoto Owners, Romspen obtained guarantees of Desoto Owners' obligations from the ML Parties. It also took security interests in the membership shares in Desoto Owners held by ML Holdings and UK Palm LLC. Just prior to the scheduled foreclosure sale of the Mall Property, ML Holdings and UK Palm LLC transferred their membership interests in Desoto Owners to a newly created entity—Desoto Holding LLC—in exchange for Desoto Holding's assumption of the debt to Romspen. The Debtors then filed their respective chapter 11 petitions on September 22, 2020.

### C.  **Events Subsequent to Chapter 11 Filing**

1. Mall Operations

On October 1, 2020 Desoto Owners filed a motion seeking authority to use proceeds of rent collections to pay for expenses necessary to continue operations at the Mall. On October 7, 2020 Romspen filed an objection to the motion. The parties have stipulated to Desoto Owners' continued use of cash collateral. The Mall operations have continued to be a little better than break-even (without accounting for taxes, payments to Romspen or insurance). However, during this period Desoto Owners was able to collect back rent payments from Hudson's, which monies were turned over to Romspen to reduce the judgement debt.

Desoto Owners has also continued administrative proceedings, commenced pre-petition, to reduce its property tax obligations. On December 20, 2020, the special magistrate of the Value Adjustment Board of Manatee County, recommended that the taxable value of the Mall Property be reduced by approximately 22%. That recommendation was adopted on March 22, 2021.

2. Romspen's Initial Motions to Dismiss.

On October 16, 2020, Romspen filed a motion to dismiss the Desoto Owners' case or, alternatively, for relief from the automatic stay. On the same day Romspen filed a motion to dismiss the Desoto Holding case. The Debtors filed opposition to the Romspen motions and the Bankruptcy Court held an evidentiary hearing on February 17 and 18 2021 to determine the Romspen motions. The Romspen Motions were denied by order dated March 23, 2021.

3. Debtor in Possession Financing.

On October 23, 2020, Desoto Owners filed a motion to borrow up to $500,000 from ML Holdings to pay for various necessary expenses of administering its chapter 11 case as needed. Over the objection of Romspen, the Bankruptcy Court approved the motion. Under the terms of the loan, repayment as an administrative expense is required, without interest, only if a plan of reorganization is confirmed in this case.

4. Continuation of Property Development.

Kimley Horn, retained by Desoto Owners pre-petition continued its work processing Desoto Owners' application to the County of Manatee for approval of its preliminary site plans. On December 22, 2020, after 3 months of diligent follow-up, the preliminary site plans were approved.. In furtherance of its plans to develop the Property, Desoto Owners obtained an order from the Bankruptcy Court entered on March 2021, authorizing it to exercise its rights to terminate tenant leases. Notices of termination have been sent to those tenants whose leases are subject to termination upon notice.

5. Failure of Prior Plans and Stay Relief Order.

The Debtors previously filed and amended a reorganization plan which would have allowed for development of the Mall Property in accordance with the site plan preliminarily approved by Manatee County. The Debtors were unable to confirm that plan. Romspen then filed a new motion for relief from the automatic stay, which resulted in an order granting immediate relief as to Romspen proceeding against guarantors of the Desoto Owners' debt to it and conditioned relief against the Debtors on the Debtors' failure to achieve certain milestones relating to confirmation and consummation of the Plan.

### D.    **The Proposed Plan**

Pursuant to an order of the Bankruptcy Court entered in the Debtor's Chapter 11 Case, the Bankruptcy Court has approved this Disclosure Statement, and further authorized the Debtors to solicit acceptances of the Plan.

In proposing the Plan, the Debtors have determined that an auction sale of the Mall Property and the infusion of the GUC Administrative Reserve provides the maximum recovery from the Debtors' assets.

## V.    THE PLAN

THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE PLAN. ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.

### A.    Overview

The Debtors will be selling the Mall Property at an auction to be conducted by CBRE, Inc. pursuant to a sale process approved by the Bankruptcy Court. By no later than August 19, 2021 the Debtors will file a sale motion seeking approval of the marketing and auction process for the Mall Property. The GUC Administrative Reserve to be deposited with the Debtors' counsel by one of both of the ML Parties will fund payments for U.S. Trustee fees, Administrative Expenses and a distribution to unsecured creditors. The proceeds of the Auction Sale of the Mall Property will be used to pay real estate tax liens, including those of Class 1 and Class 2 claims, and then Romspen's Claim. If funds are left over after Romspen's claim is paid in full, the proceeds will be used to pay down unpaid administrative expenses not fully satisfied by the GUC Administrative Reserve and, thereafter, Allowed General Unsecured Claims.

### B.    Classification of Claims and Interests under the Plan

1.          Unclassified Administrative and Priority Tax Claims

Generally. Allowed Administrative Claims and Priority Tax Claims are not classified in the Plan, and have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof. The treatment of and consideration to be received by Holders of Allowed Administrative Claims and Allowed Priority Tax Claims pursuant to this Article II of the Plan shall be in full and complete satisfaction, settlement, and release of such Claims. The Debtor's obligations in respect of such Allowed Administrative and Priority Tax Claims shall be satisfied in accordance with the terms of the Plan.

Administrative Claims. Administrative Claims include Claims under section 503(b) of the Bankruptcy Code that are entitled to priority under section 507(a)(1) of the Bankruptcy Code, for costs or expenses of administration of the Chapter 11 Case, including, without limitation, any actual and necessary expenses of operating the business of the Debtors or preserving their Estates, and any and all fees and expenses of Professionals to the extent allowed by the Bankruptcy Court under sections 330, 331 or 503 of the Bankruptcy Code. Each Holder of an Allowed Administrative Claim shall be paid from the GUC Administrative Reserve on the latest of: (a) the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; provided, that Allowed Administrative Claims that arise in the ordinary course of a Debtor's business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions. Notwithstanding the foregoing, no request

for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

Allowed Administrative Claims shall share *pro rata* in the GUC Administrative Reserve after all U.S. Trustee Fees have been paid and shall be entitled to further payment only if Romspen's Allowed Claims are paid in full or are paid from proceeds of assets not subject to Romspen's liens.

Except as otherwise provided in this Article II of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. ***Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their Property and such Administrative Claims shall be deemed discharged as of the Effective Date***. Objections to such requests, if any, must be Filed and served on the Debtors and the requesting party by the deadline established for such objections under Section 8.01 of the Plan.

The Debtors estimate that as of the Effective Date there will be no Allowed Administrative Claims other than for Professional Fee Claims. As defined under the Plan, Administrative Claims do not include claims for real property taxes on the Mall Property accrued in favor of Manatee County which have become unavoidable liens on the Mall Property.

a.    <u>Priority Tax Claims</u>.  Priority Tax Claims constitute Claims of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

Allowed Priority Tax Claims shall be paid, at the election of the Debtors, in full, with statutory interest within five (5) Business Days after the Closing Date of the Auction Sale of the Mall Property.  If Romspen is the Winning Bidder at the Auction Sale, it shall advance these funds at the closing.

c.    <u>Professional Compensation</u>. All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Effective Date shall be Filed no later than twenty (20) days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, and once approved by the Bankruptcy Court, shall be promptly paid.

d.    <u>Statutory Fees</u>. All fees and interest due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date, shall be paid promptly after the Effective Date. The Debtors shall File with the Bankruptcy Court post-confirmation quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay quarterly fees and interest to the U.S. Trustee until the earliest of such Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

The Debtors estimate $250,000 in such fees payable shortly after the Effective Date.

2.    <u>Impaired Claims and Interests</u>

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. A Claim or an Interest is classified in a particular Class only to the extent

that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class. A Claim or Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. Except as otherwise provided in the Plan, a Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date. All Claims against and Interests in a Debtor, of whatever nature, whether or not scheduled, liquidated or unliquidated, absolute or contingent, including all claims arising from transactions with that Debtor or rejection of executory contracts and all Interests arising from the ownership of the stock or other membership interests in a Debtor, whether resulting in an Allowed Claim or not, shall be bound by the provisions of the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | MTAG Secured claim | Unimpaired | Not Entitled to Vote |
| 2 | ATCF Secured Claim | Unimpaired | Not Entitled to Vote |
| 3 | Romspen Secured Claim | Impaired | Entitled to Vote |
| 4 | Hudson's | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Interests in Desoto Owners LLC | Impaired | Not Entitled to Vote |
| 7 | Interests in Desoto Holding LLC | Impaired | Not Entitled to Vote |

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Class of Interests, are Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversies.

## C.    Treatment of Impaired Claims and Interests under the Plan

Generally.  Subject to Article VII of the Plan, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.    Class 1 – MTAG's Secured Claim.  The Class 1 Secured Claim is Unimpaired and not entitled to vote on the Plan. MTAG's Allowed Secured Claim shall paid in full on the Effective Date from the proceeds of the Auction Sale.

2.    Class 2 - ATCF's Secured Claim.  The Class 2 Secured Claim is Unimpaired and not entitled to vote on the Plan. ATCF's Allowed Secured Claim shall paid in full on the Effective Date from the proceeds of the Auction Sale.

3.    Class 3 –Romspen Allowed Secured Claim.  The Class 3 Claim is Impaired and entitled to vote on the Plan. Until such time as its Allowed Claim is paid in full, Romspen shall receive all of the

proceeds of the Auction Sale remaining after payment of (i) the Class 1 Allowed Claim; (ii) the Class 2 Allowed Claim (iii) any pre-petition or post-petition claim which has become an unavoidable lien on the Mall Property, (collectively, the "Senior Secured Claims") until Romspen's Allowed Claim is paid in full. Romspen's credit bidding rights under 11 U.S.C. § 363(k) shall be unimpaired, except as may be limited by written agreement between the Debtors and Romspen. To the extent that Romspen is the Winning Bidder at the Auction Sale, Romspen shall pay the Senior Secured Claims on the Closing Date. The Romspen Secured Claim is an Allowed Claim and any amounts paid thereon shall reduce the Guaranty Claims by such amount.

The Debtors are waiving any claims against Romspen that could have been asserted under 11 U.S.C. 506(c).

Romspen has filed a secured claim in the amount $30,750,899.14, which is an Allowed Claim.

5.    Class 4 – Allowed Hudson's Claims. The Class 4 Unsecured Claim is Impaired and entitled to vote on the Plan. Hudson's Lease shall  be assumed and assigned to the Winning Bidder pursuant to the Sale Order, with the purchase option contained in Article 43 thereof being deemed valid and enforceable and the Mall Property being transferred subject to such option.  Hudson's claim under the Plan shall be treated as Impaired by virtue of a waiver of its cure claim.  Upon the Sale Order becoming a Final Order, Hudson's shall waive its cure claim and its claim shall be treated as fully satisfied under the Plan.  Any post–assumption and assignment breach by the Winning Bidder shall not result in any claim against either Estate.

6.    Class 5 - Allowed General Unsecured Claims.  Class 5 is Impaired. Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

Each Holder of a Class 5 Allowed General Unsecured Claim shall receive its *Pro Rata* Share of $40,000.00 to be funded exclusively by the GUC Administrative Reserve, except that the Romspen Deficiency Claim shall not be satisfied, compromised, settled, released or discharged hereunder and Romspen's rights against (i) both Debtors under the Loan Agreement, and (ii) the ML Parties with respect to the Guaranties, are preserved in all respects and shall survive confirmation of the Plan, the closing of the Chapter 11 Cases and/or the conversion of these cases to cases under Chapter 7 of the Bankruptcy Code. The Romspen Deficiency Claim is an Allowed Claim and any amounts paid thereon shall reduce the Guaranty Claims by such amount. Each Allowed Class 5 Claim shall be paid 10 days after the Closing Date or such later date as such claim becomes an Allowed Claim. In addition, if any of the proceeds realized from the sale of the Mall Property remain after the Romspen Claims, Administrative Expense, Priority, and other Secured Claims are paid in full, such proceeds shall be distributed *pro rata* to the holders of Allowed Class 5 Claims.

The General Unsecured Claims -- are expected to approximate $1,400,000 without considering Romspen's Deficiency Claim.

7.    Class 6 - Interests In Desoto Owners LLC.  Class 6 is Impaired and deemed to reject the Plan.  Holders of Interests in Desoto Owners LLC shall receive no distribution under the Plan. On the Effective Date any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in Desoto Owners or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or interests in Desoto Owners giving rise to any Claim or Interest shall be canceled and deemed surrendered as to Desoto Owners.

8.    Class 7 - Interests In Desoto Holding LLC.  Class 7 is Impaired and deemed to reject the Plan.  Holders of Interests in Desoto Holding LLC shall receive no distribution under the Plan. On the Effective Date any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in Desoto Holding or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or interests in Desoto Holding giving rise to any Claim or Interest shall be canceled and deemed surrendered as to Desoto Holding and shall not have any continuing obligations thereunder.

E.    **Means of Implementation**

1.    Desoto Owners or the Debtors shall file the Sale Motion on or before August 19, 2021 seeking Bankruptcy Court approval of bidding and auction sale procedures for the Mall Property, including the scheduling of the Auction Sale and approval of the Winning Bidder at the Sale Hearing. On the Closing Date the Mall Property will be transferred to the Winning Bidder, subject to the assignment of the Hudson's Lease in accordance with the Plan, the Bidding Procedures, and the Sale Order.  The sale proceeds from these transfers will be used to fund, to the extent such proceeds are available, the following payments required under the Plan in the following order of priority: (i) CBRE's fees as such may be approved by the Bankruptcy Court; (ii) prepetition and post-petition claims which have become unavoidable liens on the Mall Property, including the Allowed Claims of Class 1 and Class 2 creditors and those of Manatee County for unpaid 2020 and 2021 real estate taxes; (iii) Romspen's Allowed Claims; (iv) U.S. Trustee fees (v) Allowed Administrative Claims and (vi) Class 5 Claims.  The Mall Property shall be marketed according to the bidding and sale procedures approved by the Bankruptcy Court in accordance with the Sale Motion.

2.    Admin/GUC Reserve /Settlement of Insider Claims. In exchange for a release of all claims held by the Debtors against the ML Parties, the ML Parties shall fund the Admin/GUC Reserve in the amount of $650,000 to pay (i) Class 5 Allowed Claims in the amount of $40,000.00. (ii) U.S. Trustee Fees; and then (iii) Allowed Administrative Claims subject to the Administrative Claims Cap.

3.    Exemption from Certain Transfer Taxes and Fees.  To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any transfer of the Mall Property pursuant to the Plan (including the portion occupied by Hudson's) and any mortgage or instrument recorded in connection with such transfer shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

F.    **Treatment of Executory Contracts and Unexpired Leases.**

1.    General Rejection of Executory Contracts. With the exception of Hudson's Lease, the Plan constitutes and incorporates a motion by the Debtors, in accordance with Section 365 of the Bankruptcy Code, to reject any executory contract and/or unexpired lease.

2.    Rejection Damage Claims.  Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court

within the latest to occur of: (1) 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; and (2) 30 days after notice of any rejection that occurs after the Effective Date.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, their Estates, or property of the foregoing parties, without the need for any objection by the Debtors, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

**G.      Provisions Governing Distributions.**

1.      _Timing and Calculation of Amounts to Be Distributed_. Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Interest (or such Holder's affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

2.      _Delivery of Distributions in General_. Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims, except as otherwise provided in this Article VII, shall be made to Holders of record as of the Distribution Record Date by the Debtors:  (1) to the signatory set forth on any of the Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Debtors after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtors has not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Case on such Holder's behalf.  Subject to this Article VII, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

3.      _Unclaimed Property_. Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed distribution within 60 days after the first distribution is made to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for the undeliverable or unclaimed distribution against the Debtors, the Estates, or their respective properties or assets.  In such cases, any Cash or other property held by the Debtors on account of such claims for undeliverable or unclaimed distributions, shall become the property of Debtors notwithstanding any federal or state escheat laws to the contrary. The Debtors and their respective agents and attorneys are under no duty to take any action to attempt to locate any Claim Holder.

4.      Compliance With Tax Requirements. In connection with the Plan, to the extent applicable, the Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors each reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. Property deposited into the various Claim distribution accounts described elsewhere in the Plan (including the Priority Claims Reserve) will be subject to disputed ownership fund treatment under section 1.468B-9 of the United States Treasury Regulations. All corresponding elections with respect to such accounts shall be made, and such treatment shall be applied to the extent possible for state, local, and non-U.S. tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS with respect to such accounts, any taxes (including with respect to interest, if any, or appreciation in property between the Effective Date and date of distribution) imposed on such accounts shall be paid out of the assets of such accounts (and reductions shall be made to amounts disbursed from such accounts to account for the need to pay such taxes).

5.      Fractional Cents. Any other provision of the Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

6.      Payments of Less than One Hundred Dollars.  If a Cash payment otherwise provided for by the Plan with respect to an Allowed Claim or Interest would be less than one hundred dollars ($100.00) (whether in the aggregate or on any payment date provided in the Plan), notwithstanding any contrary provision of the Plan, the Debtors shall not be required to make such payment.

7.      Setoffs.  Except as otherwise provided for herein, the Debtors, may, but shall not be required to, set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or their estates may have against the Creditor, but neither the failure to do so nor the allowance of a Claim hereunder shall constitute a waiver or release by the Debtors or their estates of any Claim they may have against the Creditor.

8.      Allocations. Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

9.      No Postpetition Interest on Claims. Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

10.      Sections 506(c) and 552(b) Waiver in Favor of Romspen.  The Debtors shall be deemed to have waived, and Romspen shall be deemed to have received a waiver of, (a) the provisions of section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code.

**H.      Procedures For Resolving And Treating Contested And Contingent Claims And Interests.**

1.      Objections to Claims.  The Confirmation Order shall provide that from and after the Effective Date only the Debtors shall have authorization to file and/or prosecute objections to Claims and/or Interests. Objections to Claims shall be filed with the Bankruptcy Court and served upon the affected Creditor(s) or Interest Holder(s) no later than one hundred twenty (120) days after the Effective Date; provided, however, that this deadline may be extended by the Bankruptcy Court upon motion of the Debtors. Unless an Order of the Bankruptcy Court specifically provides for a later date, any Proof of Claim or proof of Interest filed after the Confirmation Date shall be automatically Disallowed as a late filed claim, without any further action by the Debtors or the Debtors being required, unless and until the party filing such Claim obtains the written consent of the Debtors to file such Claim or Interest late or obtains an Order of the Bankruptcy Court upon notice to the Debtors and Debtors that permits the late filing of the Claim or Interest, in which event, the Debtors and the Debtors shall have one hundred twenty (120) days from the date of such written consent or Order to object to the allowance of such Claim, which deadline may be extended by the Bankruptcy Court upon consent of the Holder of such late Claim or on motion of the Debtors, without notice or a hearing. Subject to Bankruptcy Court approval, objections to Claims and/or Interests may be litigated by the Debtors to judgment, settled or withdrawn, in their respective discretion.

2.      No Distribution Pending Allowance. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim or Disputed Interest unless and until all objections to such Disputed Claim or Disputed Interest have been determined by a Final Order of the Bankruptcy Court.

3.      Reserve for Allocated Distributions. The Debtors shall withhold from the property to be distributed under the Plan an amount which shall be sufficient to be distributed on account of such Disputed Claim(s). As to any Disputed Claim, upon a request for estimation by the Debtors, and/or Debtors, as the case may be, the Bankruptcy Court shall determine what amount is sufficient to withhold.

4.      Distributions after Allowance.  Payments and Distributions to each Holder of a Disputed Claim, to the extent such Disputed Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which the subject Claim belongs.

5.      Treatment of Contingent, Disputed and Unliquidated Claims.  Until such time as a contingent, unliquidated or Disputed Claim becomes fixed, liquidated, absolute, and Allowed, such claim shall be treated as a Disputed Claim for purposes related to estimations, allocations, and Distributions under the Plan.

6.      Preservation of Rights. Except to the extent that any Claim is Allowed during the Chapter 11 cases or expressly by the Plan, or the Confirmation Order, nothing, including, but not limited to, the failure of the Debtors, to object to a Claim or Interest for any reason during the pendency of the Chapter 11 Case, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Debtors with respect to any Claim or Interest, including, but not limited to, all rights of the Debtors to contest or defend themselves against such Claims or Interests in any lawful manner or forum when and if such Claim or Interest is sought to be enforced by the Holder thereof.

7.      Estimation of Claims. Before, on, or after the Effective Date, either of the Debtors, may (but is not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law other than the Claims of Romspen and Hudson's, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim,

including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors and Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

8.    <u>Disallowance of Claims</u>. Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estate by that Entity have been turned over or paid to the Debtors. Except as otherwise provided herein or as agreed to by the Debtors, any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.

9.    <u>Amendments to Claims</u>. On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Debtors, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

## VI.    <u>SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS</u>

A.    <u>Compromise and Settlement of Claims, Interests, and Controversies</u>. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have, or any distribution to be made on account of such Allowed Claim or Allowed Interest, other than with respect to the Romspen Deficiency Claim. Except as provided herein, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, the Estate, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Debtors may compromise and settle any Claims and Causes of Action held by the Debtors against other Entities.

B.    <u>**Term of Injunctions or Stays**</u>. Unless otherwise provided in the Plan, the Confirmation

Order or the Conditional Stay Relief Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.  To the extent of any inconsistency between the Conditional Stay Relief Order and the Confirmation Order the Conditional Stay Relief Order shall control.

C.    **Exculpation**.    Notwithstanding anything contained in the Plan to the contrary, no Exculpated Party shall have or incur liability for, and each Exculpated Party is released and exculpated from, any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, or filing of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Case, solicitation of votes on the Plan, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, and, except with respect to the Debtors' court-approved attorneys pre-Petition Date conduct related solely to the formulation, preparation, negotiation, or filing of the Plan and the Disclosure Statement, solely with respect to the time period from the Petition Date through the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not release or exculpate any Claim relating to any pre-Petition Date or post-Effective Date obligations of any party (except with respect to the Debtors' court approved attorneys pre-Petition Date conduct for the acts and omissions described above) or Entity under the Plan, or any document, instrument, or agreement executed to implement the Plan.

For the avoidance of doubt, the exculpation contained in the Plan shall have no impact on the Guaranty Claims or the pre-Petition Date transfer of the equity interests in Desoto Owners to Desoto Holding.

## VII.    <u>CONDITIONS TO EFFECTIVENESS OF THE PLAN</u>

<u>Conditions Precedent to the Effective Date</u>. It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied:

1.    The Confirmation Order shall have been duly entered and in full force and effect by no later than September 20, 2021;

2.    The Auction Sale shall have concluded by no later than October 4, 2021;

**3.** The Winning Bidder shall have closed on the Auction Contract by no later than October 15, 2021; and

**4.** The Admin/GUC Reserve shall have been fully funded by no later than the Confirmation Hearing.

<u>Effect of Failure of Conditions</u>.  The Debtors, with the express written consent of Romspen, which consent may be withheld for any reason ,may at any time, without notice or authorization of the Bankruptcy Court, waive or modify any condition set forth above.  The waiver or modification of any of these conditions shall not abridge or have any impact on Romspen's ability to exercise its rights under the Conditional Stay Relief Order.

<u>Substantial Consummation</u>.  "Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## VIII.    <u>MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN</u>

**A.**    **Modification of Plan**.  Modifications of the Plan may be proposed in writing by the Debtors at any time before Confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Plan may be modified at any time after Confirmation and before its substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code. A Holder of a claim or Interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection. Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**B.**    **Revocation of the Plan**.  The Debtors reserve the right to revoke and withdraw the Plan prior to entry of the Confirmation Order.  If the Debtors revoke or withdraw the Plan, or if Confirmation of the Plan does not occur, then the Plan shall be deemed null and void.  In order to effectuate a revocation of the Plan, the Debtors shall file a notice of such revocation with the Bankruptcy Court and serve a copy on all parties entitled to notice.

## IX.    <u>RETENTION OF JURISDICTION</u>

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan, including jurisdiction to:

**1.**    Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

**2.**    Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

**3.**    Resolve any matters related to:  (a) the assumption or rejection of any Executory

Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure amounts pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) amending, modifying, or supplementing, after the Effective Date, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including, without limitation, arising under or in connection with the Asset Sale Transaction;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code, including the Sale Order;

10.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article X hereof and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to the Plan;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, or the Confirmation Order;

16.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     Determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     Hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan;

21.     Enforce all orders previously entered by the Bankruptcy Court in these cases, including but not limited to the Conditional Stay Relief Order;

22.     Hear any other matter not inconsistent with the Bankruptcy Code; and

23.     Enter an order closing either Chapter 11 Case

## X.     **GENERAL PROVISIONS**

A.     **Immediate Binding Effect**.  Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtor, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with a Debtor.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.     **Additional Documents**. On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, all Holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     **Reservation of Rights**. Before the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtors with respect to the Plan, the Disclosure Statement, or the Confirmation Order shall be or shall be deemed to be an admission or waiver of any rights with respect to any Claims or Interests.

D.     **Notices**.   Any notice required or permitted to be provided to the Debtors under the Plan shall be in writing and served by (i) email at inutovic@nutovic.com and (ii) either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight courier service, freight prepaid, to be addressed as follows:

If to either of Desoto Owners LLC or Desoto Holding LLC:
Nutovic & Associates
261 Madison Avenue, 26th Floor
New York, N.Y. 10016

**E.**     **Saturday, Sunday or Legal Holiday**.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**F.**     **Severability**.  If any term or provision of the Plan is held by the Bankruptcy Court prior to or at the time of Confirmation to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  In the event of any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan may, at the Debtors' option, remain in full force and effect and not be deemed affected.  However, the Debtors reserve the right not to proceed to Confirmation or consummation of the Plan if any such ruling occurs.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**G.**     **Votes Solicited in Good Faith**.  Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code, and, therefore, neither any of such parties or individuals nor the Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

**H.**     **Waiver and Estoppel**.  Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest shall be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

**I.**     **Exhibits**.  All exhibits attached hereto are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above.

## XI.     **CERTAIN RISK FACTORS**

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Plan and its implementation.

**A.**     **Bankruptcy Law Considerations**.  The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

**B.**        **Parties in Interest May Object to the Plan's Classification of Claims and Interests**
Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**C.**        **The Conditions Precedent to the Effective Date of the Plan May Not Occur**. As more fully set forth in Article X of the Plan, the Effective Date is subject to conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

**D.**        **The Debtors May Not Be Able to Secure Confirmation of the Plan**. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims and Interests within a particular Class under such plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear what, if anything, Holders of Allowed Claims would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article X of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation, other than the conditions to effectiveness set forth in Article X, for which modification requires the express written consent of Romspen. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

**E.**        **Nonconsensual Confirmation**. In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).

The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses.

      **F.**    **The Debtors' Chapter 11 Cases May Be Converted to Chapter 7 Cases**. If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.

      The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the Mall Property would have to be sold in a distressed fashion over a short period of time rather than have values enhanced through development, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

      **G.**    **The Debtors May Object to the Amount or Classification of a Claim**. Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

      **H.**    **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**. The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

      The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

## XII.    SOLICITATION AND VOTING PROCEDURES

      This Disclosure Statement is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit "B"**.

      **THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT**

**THE PLAN.**

THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

A.  **Holders of Claims Entitled to Vote on the Plan.** Under the provisions of the Bankruptcy Code, not all Holders of claims and interests against a debtor are entitled to vote on a chapter 11 plan.  The table in Article III of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan. The Holders of Class 3, 4 and 5 Claims are Impaired under the Plan and will receive a Distribution under the Plan.  Accordingly, Holders of Allowed Claims in those classes have the right to vote to accept or reject the Plan. Additionally, the Disclosure Statement Order provides that certain Holders of Claims, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

B.  **Voting Record Date.** The Voting Record Date is _____.  The Voting Record Date (as defined in the Disclosure Statement Order) is the date on which it will be determined which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

C.  **Voting on the Plan.** The Voting Deadline is _____ at 5:00 p.m. prevailing Eastern Time.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are actually received by the Ballot Agent on or before the Voting Deadline:

Nutovic & Associates
261 Madison Avenue, 26th Floor
New York, NY 10016
Attn:  Isaac Nutovic
inutovic@nutovic.com
Facsimile (212) 697-4432

D.  **Ballots Not Counted**. No ballot will be counted toward Confirmation if, among other things:  (1) any ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (2) any ballot cast by any Entity that does not hold a Claim; (3) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00 if it is not scheduled as disputed); (4) any unsigned ballot or ballot lacking an original signature (5) any ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (6) any ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein.  Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

E.  **Confirmation Hearing**. The Bankruptcy Court has scheduled the Confirmation Hearing for _____, ___ _.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors and their

counsel, and certain other parties, by no later than _____, at 5:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit "B"** and incorporated herein by reference.

### XIII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN ANTICIPATED U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS PROPOSED BY THE PLAN TO THE DEBTOR AND HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS SUMMARY IS PROVIDED FOR INFORMATION PURPOSES ONLY AND IS BASED ON THE INTERNAL REVENUE CODE, TREASURY REGULATIONS PROMULGATED THEREUNDER, JUDICIAL AUTHORITIES, AND CURRENT ADMINISTRATIVE RULINGS AND PRACTICE, ALL AS IN EFFECT AS OF THE DATE HEREOF AND ALL OF WHICH ARE SUBJECT TO CHANGE OR DIFFERING INTERPRETATION, POSSIBLY WITH RETROACTIVE EFFECTS THAT COULD ADVERSELY AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.

THIS SUMMARY DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF ITS PARTICULAR FACTS AND CIRCUMSTANCES OR TO CERTAIN TYPES OF HOLDERS OF CLAIMS SUBJECT TO SPECIAL TREATMENT UNDER THE BANKRUPTCY CODE (FOR EXAMPLE, NON-U.S. TAXPAYERS, FINANCIAL INSTITUTIONS, BROKER-DEALERS, INSURANCE COMPANIES, TAX-EXEMPT ORGANIZATIONS, AND THOSE HOLDING CLAIMS THROUGH A PARTNERSHIP OR OTHER PASS-THROUGH ENTITY). IN ADDITION, THIS SUMMARY DOES NOT DISCUSS ANY ASPECTS OF STATE, LOCAL, OR NON-U.S. TAXATION AND DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS THAT ARE UNTMPAIRED UNDER THE PLAN, HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO VOTE UNDER THE PLAN, AND HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY UNDER THE PLAN.

THE TAX RULES DESCRIBED HEREIN ARE COMPLEX AND THEIR APPLICATION IS UNCERTAIN IN CERTAIN RESPECTS. EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES (INCLUDING STATE, LOCAL AND NON-U.S.) OF THE PLAN TO SUCH HOLDER.

A SUBSTANTIAL AMOUNT OF TIME MAY ELAPSE BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE RECEIPT OF A FINAL DISTRIBUTION UNDER THE PLAN. EVENTS SUBSEQUENT TO THE DATE OF THIS DISCLOSURE STATEMENT, SUCH AS ADDITIONAL TAX LEGISLATION, COURT DECISIONS, OR ADMINISTRATIVE CHANGES, COULD AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREUNDER. NO RULING HAS BEEN OR IS EXPECTED TO BE SOUGHT FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OR IS EXPECTED TO BE OBTAINED BY THE DEBTORS WITH RESPECT THERETO.

**TO ENSURE COMPLIANCE WITH UNITED STATES INTERNAL REVENUE SERVICE CIRCULAR 230, (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS, FOR PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON SUCH HOLDERS UNDER THE BANKRUPTCY CODE; (B) SUCH DISCUSSION IS WRITTEN TO SUPPORT THE PROMOTION OF THE PLAN; AND (C)**

**EACH HOLDER OF A CLAIM SHOULD SEEK ADVICE BASED ON SUCH HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.       **U.S. Federal Income Tax Consequences to the Debtor**

Under the Bankruptcy Code, COD income is recognized by a partnership to the extent, and at the time, that certain debts are discharged for less than full payment. The COD income recognized at the partnership level is then allocated among the partners pursuant to the allocation provisions of the partnership agreement, if such provisions comply with the requirements of the Bankruptcy Code regarding allocations, or, if not, in accordance with the partners' interests in the partnership. The Bankruptcy Code's bankruptcy and insolvency exceptions to the general rule requiring recognition of COD income apply at the partner level and not at the partnership level. Therefore, for the bankruptcy or insolvency exception to apply to COD income allocated to a partner, the partner either must be in a bankruptcy case or be insolvent. In general, COD income is the amount equal to the difference between the adjusted issue price of the indebtedness discharged and the sum of (i) the amount of any cash and (ii) the fair market value of any other property transferred in satisfaction of the discharged indebtedness. COD income also includes any interest that the taxpayer deducted under the accrual method of accounting but remains unpaid at the time the indebtedness is discharged.

B.       **U.S. Federal Income Tax Consequences to Claim Holders**

The U.S. federal income tax consequences to a Holder receiving, or entitled to receive, a payment in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the Holder's method of accounting, and its own particular tax situation. Because the Holders' Claims and tax situations differ, Holders should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

A Holder receiving a payment under the Plan in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (i) the amount of cash and the fair market value (if any) of any property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. The character of any income or loss that is recognized will depend upon a number of factors, including the status of the creditor, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the Claim. This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Holder's trade or business for the performance of services or for the sale of goods or merchandise. Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the Holder's hands.

C.       **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XIV.    FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A.    Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. The Plan calls for a sale of the Debtors' Mall Property. Appraisal testimony before the Bankruptcy Court indicated a value of the Mall Property in excess of $20,000,000, which is well in excess of the minimal amounts needed to confirm a plan. As a result, the Debtors believe that the Bankruptcy Court will conclude the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

### B.    Acceptance of the Plan

As a condition to Confirmation, the Bankruptcy Code requires that each Class of impaired Claims vote to accept the Plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds (2/3) in dollar amount and more than one-half (½) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, Holders of Claims in each of Classes 1 and 4 will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

### C.    Best Interests Test

As noted above, even if a plan is accepted by each class of Claims and Interests, the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan is in the best interests of all Holders of Claims and Interests that are impaired by the Plan and that have not accepted the Plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find either that all members of an impaired class of Claims or Interests have accepted the Plan or that the Plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the Plan, that is not less than the amount that such Holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to Holders of each impaired class of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee. The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid administrative expenses incurred by the debtor in its Chapter 11 case that are allowed in the Chapter 7 case, litigation costs and claims arising from the operations of the debtor during the pendency of the Chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would

also prompt the rejection of a large number of executory contracts and unexpired leases and thereby enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the Bankruptcy Court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security Holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security Holders under the plan, then the plan is not in the best interests of creditors and equity security Holders.

**D.**    **Liquidation Analysis**

The Debtors believe that the liquidation of the Debtors' assets through the Plan would provide no less a recovery from the Mall Property than in a chapter 7 liquidation, but without the additional layer of chapter 7 administration expense. Furthermore, one or both of the ML Parties, are providing $650,000 for the GUC Administrative Reserve in settlement of estate claims against them. A chapter 7 trustee is not likely to recover that amount (net of legal fees) in pursuit of such claims. Accordingly, the Debtors believe there is no doubt that conversion of these cases to chapter 7 would achieve a superior result to that expected under the Plan.

**E.**    **Confirmation Without Acceptance of All**
        **Impaired Classes: The "Cramdown" Alternative**

In the event any Class of Impaired Claims or Interests rejects the Plan, the Debtors may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if a plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it, the plan does not discriminate unfairly and is "fair and equitable" as to each impaired class that has not accepted the plan.

The Debtors believe that they could, if necessary, meet the non-discrimination and "fair and equitable" requirements of Section 1129(b) of the Bankruptcy Code.

[Remainder of Page Blank]

## XV.    <u>CONCLUSION</u>

The acceptances of the Plan by the Holders of all Classes of impaired Claims and Interests entitled to vote are hereby solicited. The Debtors believes that Confirmation of the Plan is in the best interests of all Creditors and Interest Holders entitled to vote thereon and strongly urge all Creditors and Interest Holders to vote to accept the Plan.

Dated:  August 13, 2021

**DESOTO OWNERS LLC**,

By:  /s/<u>Meyer Lebovits</u>
    Name: Meyer Lebovits
    Its:  Managing Member

**DESOTO HOLDING LLC**,

By:   /s/<u>Meyer Lebovits</u>
    Name: Meyer Lebovits
    Its:  Managing Member

41353221v2